REDACTED                    1

<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA,      :        04 CR 00749
 4
                     v.             :        U.S. Courthouse
 5                                           Brooklyn, New York
     GABRIEL VILLADA,               :
 6                                           September 28, 2012
                     Defendant.:             10:30 o'clock a.m.
 7
     - - - - - - - - - - - - - - - - - - - X
 8

 9                    TRANSCRIPT OF SENTENCING
                     BEFORE THE HONORABLE JOHN GLEESON
10                   UNITED STATES DISTRICT JUDGE.

11
     APPEARANCES:
12
     For the Government:           LORETTA E. LYNCH
13                                 United States Attorney
                                   By:  WALTER NORKIN
14                                 Assistant U.S. Attorney
                                   271 Cadman Plaza East
15                                 Brooklyn, New York 11201

16   For the Defendant:           JOSEPH ROSENBAUM, ESQ.
                                   ALESSANDRA DeBLASIO, ESQ.
17

18   Court Reporter:              Anthony M. Mancuso
                                   225 Cadman Plaza East
19                                 Brooklyn, New York 11201
                                   (718) 613-2419
20

21

22

23   Proceedings recorded by mechanical stenography, transcript
     produced by CAT.
24

25
</pre>

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

2

1         (Case called; both sides ready.)

2         MR. NORKIN:  Walter Norkin for the government.  Good

3 morning, your Honor.

4         THE COURT:  Good morning.

5         MR. ROSENBAUM:  Good morning, your Honor.  Joe

6 Rosenbaum on behalf of Mr. Herrera.

7         MS. DeBLASIO:  Good morning.  Alessandra DeBlasio on

8 behalf of Mr. Herrera.

9         MR. NORKIN:  I would also note that United States

10 Probation Officer Shayna Bryant is here.

11         MS. BRYANT:  Good morning, your Honor.

12         THE COURT:  Good morning.

13         (Interpreter sworn.)

14         THE INTERPRETER:  Maristela Verastegui, certified

15 Spanish interpreter.

16         THE COURT:  Good morning, Maristela.

17         THE INTERPRETER:  Good morning, your Honor.

18         THE COURT:  All right.

19         Are you ready to proceed to sentence?

20         MR. ROSENBAUM:  Yes, your Honor.

21         THE COURT:  There's a Presentence Report.

22         Ms. Bryant, are there any addenda to this report?

23         MS. BRYANT:  There were no addenda issued in

24 relation to this report.

25         THE COURT:  Have you seen this Presentence Report?

ANTHONY M. MANCUSO.  CSR  OFFICIAL COURT REPORTER

3

1          MR. ROSENBAUM:  Yes, your Honor.

2          THE COURT:  Have you had this Presentence Report

3   translated for you, sir?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  And have you had enough time to go over

6   it with your lawyer?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  Any objections to the Presentence

9   Report?

10          MR. ROSENBAUM:  No, your Honor.

11          THE COURT:  All right.  How about from you?

12          MR. NORKIN:  No, your Honor.

13          THE COURT:  All right.

14          The advisory range is 262 to 327 months.

15          And there's a motion from the government; right?

16          MR. NORKIN:  That's correct.

17          MR. ROSENBAUM:  Yes, sir.

18          THE COURT:  Okay.  Do you want to be heard with

19   regard to the appropriate sentence?

20          MR. ROSENBAUM:  Yes, if we could, your Honor.

21          THE COURT:  Sure.

22          MR. ROSENBAUM:  The government and the defense have

23   worked long and hard for almost five years to reach today, and

24   what I mean by that is, Mr. Herrera, when he was arrested in

25   Colombia, reached out to U.S. law enforcement at that point to

4

1   offer his full and complete cooperation. He retained counsel.

2   And when he arrived here in the Eastern District of

3   New York right after the initial arraignment, the debriefings

4   began.

5   With Mr. Herrera, the debriefings were complete.

6   They were truthful. He didn't hold back. He didn't minimize.

7   He gave it all. Whatever the government wanted, whatever he

8   had, he debriefed.

9   A story that happened during the first debriefing is

10  that he told Ms. Klapper, who was the AUSA at that time, and

11  the agents that were there that he could get on the phone with

12  various codefendants in the case that were in Venezuela and he

13  can get them to surrender.

14  So, he made the phone call, set up the conference

15  call, and the next day, the conference call was made, and he

16  spoke to various defendants that are mentioned in the

17  government 5K1 motion. He spoke to Rivera, Betancurt,

18  Velasquez, Duque and we believe

19

20

21

22

23  on cases here that

24  Mr. Herrera helped make. That's how complete it was. That's

25  how timely it was. That's how much he wanted to assist the

5

1    government and right the wrongs that he's done.   That's what

2    he's done.   That's why it's taken so long.

3        Mr. Norkin, in his 5K1, the seven-page letter that

4    they wrote, details which indictments he's responsible for,

5    which arrests he's responsible for, which surrenders he's

6    responsible for.   And there are numerous cases:

7        Mr. Velasquez, Mr. Duque, Mr. Rivera,

8    Mr. Betancurt.

9        Besides this, there's a cascade effect, because

10   these people have information, and Mr. Herrera also provided

11   information that the government -- it wasn't enough for them

12   to indict, but it was enough information to supplement other

13   information that they had.   It's all building on one another,

14   and by providing this information over a period of years, the

15   government has put together other cases.

16       We're not saying he's responsible for the indictment

17   or the arrests, but it was intelligence that's used and shared

18   that he provided.   He volunteered to testify, and he would

19   have testified in all these trials if it was necessary, but it

20   seems it's not, because they have all pled and they are all

21   going to be sentenced.   He's also held himself out to testify

22   against other defendants in different districts if needed.   He

23   was not needed.

24       He's given information that might have led to some

25   recent arrests, even though it's not mentioned here.   Again,

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1   it's what he did.  Anything that he could do, he did.  And the

2   agents were very satisfied, the prosecutors were very

3   satisfied.  There was no balking.  He was in it.  He went all

4   in and he did it quickly.

5           Most debriefings that I have been at the client

6   minimizes, the client holds back, the client is less than

7   candid at the first meeting.  With Gabriel, it was not,

8   because he started this process while he was in Colombia, and

9   continued it as soon as he got here.  And the timeliness, the

10  completeness, the risk that his family -- some of these

11  characters are of a violent nature.  Mr. Herrera is not.  Mr.

12  Herrera is a different type of person, and Ms. DeBlasio is

13  going to go into that in a moment, that and a lot of the

14  people that stand before you.

15          But I can't -- what Mr. Norkin submitted to the

16  Court, the seven-page 5K1.1 request and the details, is very

17  complete.  Again, there's other things that could have been

18  put in there that are not as important.  Again, the cascade

19  effect.  We would ask the Court, because of the amount of   ,

20  cooperation, the timeliness, to grant the motion for 5K1.1 and

21  sentence accordingly.

22          Ms. DeBlasio -- we're kind of splitting it up.  I've

23  asked her to come in and help me at the end of this case,

24  because we went through many, many debriefings, Judge.  This

25  was a long process.

1          THE COURT:  Fine.

2          MS. DeBLASIO:  Thank you, your Honor.  If I may?

3          I submitted to your Honor a letter about the

4    medical, and so I won't discuss that now.  We are asking for

5    time served in this case, and if it is close in your Honor's

6    mind, I was hoping that you would consider the medical

7    condition.

8          But I did want to take a moment just to give a very

9    brief background of Mr. Herrera and a couple of points which I

10   think are somewhat important and relevant to the sentencing.

11         As you can read in the Presentence Report, at the

12   age of fourteen, like his four brothers and sisters, his

13   father pulled all of them out of school, he did not want them

14   to have higher education, and they all went to work for his

15   father's ranch.  At the time, his mother's brother was a

16   pretty large narcotics trafficker, who had brought in his

17   father, and Mr. Herrera was able to avoid that, so he worked

18   on the ranch.

19         He did very well.  He was well known in the area,

20   and he had a lot of power and connections, but he managed to

21   keep himself from getting involved in narcotics trafficking.

22         When he was about twenty years old, he got married.

23   They moved away to Florida.  The idea was to start again.  He

24   had two legitimate businesses while he was there.  He spent

25   four years there, and his wife decided to return, took his

8

1  children, and so he gave up on Florida and he moved back to

2  follow his children.

3           And it was at that point that he went ahead and he

4  got involved in what he now calls the inferno, and he was a

5  trafficker for seventeen years.  Cocounsel mentioned he was

6  not violent.  Certainly, he knew narcotics trafficking, and

7  the people he was associating with were very violent.  It's

8  not to say he wasn't violent, and there's no violence.

9           One of the things, though, is that he never carried

10  a weapon.  He didn't go around with bodyguard.  He didn't live

11  the lavish life-style.  He lived with his family, with his

12  children.

13           Two other points that I wanted to mention from that

14  time, sort of, as I say, the only two redeeming qualities of

15  those seventeen years but which have stayed with him is, he

16  had a lot of empathy for young children, wanted to help them

17  get the education he had not.  He gave a lot of his support,

18  money, to organizations run by both the church, lay-run

19  organizations, to help children in the countryside.  And then

20  he started three of his own organizations or foundations, all

21  of which are closed, but the point was, to help orphans, to

22  help children in very dire situations, learn skills so that

23  they could avoid what he had to do.  They could have something

24  that they could get ahead in life.

25           The last thing is that in 2007, he voluntarily

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1   withdrew from narcotics trafficking.  In 2003 to '07, he was

2   in Venezuela.  He was working with Mr. Tello there, and then

3   he left everything to come back.

4            I point out in the Presentence Report, paragraph 47,

5   it does say -- and I've mentioned this to Ms. Bryant -- it

6   mentioned that he was -- continued as a trafficker from 2007

7   to 2008.  And I believe she was relying on the indictment.

8   The indictment ends in 2007, not 2008.  And I can explain a

9   little bit how it came about.

10           But Mr. Herrera was in Venezuela, because he had to

11  flee Colombia.  He had to pay a ransom to the paramilitary, so

12  he went to Venezuela.  He continued in narcotics trafficking

13  from 2003 to 2007, paid off all of the ransom, and that's when

14  he had it and he went back to Colombia and he went back to

15  ranching with his brothers, his sister, his half-sisters and

16  brothers.  Everybody ranches in the family.  That's what he

17  did for one year, and that's what he plans to do the rest of

18  his life.

19           He started out, I think, as a decent person, as a

20  good person, certainly very empathetic to people, turned very

21  bad, and pulled himself out of it.  So, before he was

22  arrested, before he was indicted, and then I think that

23  becomes evident or obvious that as soon as he was in jail in

24  Colombia, he contacted U.S. authorities.

25           So, it goes to, I hope, your Honor's getting a

1  slightly better understanding that this person did pull out on

2  his own, and was lucky enough to be able to assist and

3  cooperate and start his own repentance, whatever it is he's

4  going to do the rest of his life.  But he's done, and when he

5  is released, he's going back to family and the ranching

6  business, which he at one point knew and did very well and

7  loved.

8            THE COURT:  All right.  Thank you.

9            You have a right to speak before sentence is

10  imposed, sir.  Is there anything that you would like to say?

11            THE DEFENDANT:  Yes, your Honor.

12            THE COURT:  Go right ahead.

13            THE DEFENDANT:

14            Just as Ms. Alessandra point out, at one point in my

15  life, I decided to open a door I shouldn't have opened, and

16  it's a life of death, of madness, of making a lot -- doing a

17  lot of harm to society.

18            And I always wanted to find a way to come back from

19  it, but it was very hard.  I always understood that you need

20  opportunities in life, and at some point, I didn't have them.

21  And I'm not trying to justify myself saying this.  I know I

22  did great harm to society, to the United States Government, to

23  my own country, to my family.

24            I was not a good example, and that, as Mr. Rosenbaum

25  pointed out, when I was captured, I immediately wanted to

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1    start cooperating, so I could make my own little contribution

2    to that Titanic fight that the government is waging against

3    drugs.

4            Even before my arrest, I wanted to do that through

5    my organization, for all of them to go back to their families.

6    We had already finished something that we were forced to do,

7    where not our own lives but our families' lives were in

8    danger.  In 2007, we made this decision.  It was a voluntary

9    decision, and it had a good purpose, so that by 2008, when my

10   arrest took place, I understood that this was a good

11   opportunity to close this chapter in my life for good.  So,

12   that's why I wanted this cooperation to be as effective as

13   possible, so I could make my contribution to this Titanic war

14   that the American Government is waging.

15           And this time in jail has been very hard for me.  It

16   has been a tough lesson.  Learning has been very difficult,

17   but I have accepted it humbly.  I've taken advantage of it to

18   grow spiritually and psychologically, and today, I want to ask

19   you to give me an opportunity so I can go back to my family.

20   I have children, and they have been affected by all of this.

21   I am very fearful that they may take the wrong path, that they

22   will deviate, and go straight, and I know I can give something

23   good for them, something different to make out of them people

24   that do good in society.

25           That's my petition, your Honor.

1    THE COURT:   Thank you.

2         It's a concern to me, and it seems to me only fair

3    to express it and allow you, the defendant and his counsel, to

4    address it, if they wish.   But I'm missing something.

5         My take is, the only thing that this man really

6    sought to contribute to was his own self-interest.   That's why

7    he got out of the drug business, because of that extortion.

8    He didn't seek to contribute to this Titanic problem until he

9    got locked up, and he did that to shorten his jail time.

10        What am I missing?   I don't understand this

11   contribution business.

12        MS. DeBLASIO:   I think that he started out in life

13   working on the ranches -- it's touched on in the Presentence

14   Report -- a lot of difficulty with his family.   His uncle and

15   father were traffickers.   He didn't like their life-style.   He

16   didn't like the way they treated the workers on the ranches

17   where he was, and for many years, the traffickers were all

18   around him, and he kept them at bay.   He became a big drinker,

19   because that's how he handled the situation.   That's who he

20   was around.   He had to grow up fast.

21        And he had a very terrible accident and crashed his

22   car and his brother died, and he spent the next year terribly,

23   terribly depressed and lost, and I think he lost his way.   I

24   think he was a good person in the beginning and he did care

25   for others, and he left to get away.

1          He went to Florida, and unfortunately his wife, very

2   difficult situation, she was bipolar, she just took the kids

3   away.  So, I think had he stayed, I don't think he would be

4   here today, but he went back for his children.

5          And then at that point, to tell you very candidly,

6   he had a lot of trouble, as I said, with his father and his

7   uncle, and he made the terrible decision to do better than

8   they did.  It was some sort of thing with his father:  I'll

9   show you.  And you are right, it was seventeen years of not

10  bad decision-making, it was horrendous, and he knows that.  He

11  knows that now.  He spent seventeen years, as I say, redeeming

12  that.

13         He himself did not get involved in the violence, and

14  he actually -- the reason he had to flee and pay the ransom

15  was because he used to intervene when he could if he knew

16  either paramilitaries or other narcotics traffickers were

17  kidnapping, extorting people.

18         So, this particular incident, a paramilitary

19  kidnapped a man, his wife and the daughter, and he intervened

20  and said, Don't kill them.  Let them go.  Let the man pay the

21  ransom.  Instead, the man went to U.S. authorities in

22  Colombia, turned on the paramilitary, and so they held

23  Mr. Herrera responsible, and so he fled.  So the self-interest

24  that he fled and self-interest that he continued.

25         This is sort of one of several examples of inside

1   him trying to help people who were less fortunate, whether it

2   was through giving money to children.  I have a couple of

3   letters.  They came in so last-minute I didn't show your

4   Honor, to try and support what I am saying.  I think that's

5   who the person is.

6          It was seventeen years of self-interest, but at the

7   time, he really did try and help, within that world, a few of

8   the others who were at threat, at risk.  And the cooperation

9   now, it's not just self-interest, because he is at terrible

10  risk.

11

12

13

14

15

16          So, it's not just self-interest.  There is risk.

17          THE COURT:  It happens to be risky for him to act in

18  his self-interest.

19          MS. DeBLASIO:  I think that's right.  It's not pure

20  self-interest, that he thinks, I'll do this and live the high

21  life or a big life.  He will go back and he will be at risk

22  the rest of his life.

23

24

25

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

4

5   But I believe that he really did try at the end to start to

6   make up for what he did, and he's continuing to make up for

7   what he did.  And, of course, his lifetime will be one knowing

8   and accepting who he was.

9          But to answer your Honor's question, I think it's

10  not black and white.  I think there, of course, is

11  self-interest, as with all cooperators, but part of the way,

12  as your Honor knows well, this system works, this enables us

13  to prosecute others because self-interest, but they do help.

14  I would just say he didn't have to help as much, and he didn't

15  have to put himself at that risk.

16          THE COURT:  Thank you.

17          Mr. Norkin.

18          MR. NORKIN:  Your Honor, my letter, I think,

19  discusses pretty completely both the substantial nature of the

20  defendant's crime and also his substantial cooperation.  So, I

21  won't add to that.

22          One update I have is that Mr. Duque, who is referred

23  to on page three, was sentenced last week by Judge Dearie to

24  thirty-six months.  And I would also let your Honor know that

25  whatever -- when --

```
 1

 2

 3          THE COURT:  Thirty-six months.  How did he compare

 4   in culpability to Mr. Herrera?

 5          MR. NORKIN:  As that paragraph points out, he and

 6   his partner Velasquez were arguably smaller players than

 7   Mr. Herrera.  Still, 40,000 kilograms is not an insignificant

 8   amount.

 9          THE COURT:  Okay.

10          MR. NORKIN:  Finally, I just want to let your Honor

11   know when Mr. Rosenbaum and Ms. DeBlasio pointed out some of

12   the medical issues that were coming up, I did speak with

13   Bureau of Prisons, and to the extent your Honor sentences

14   Mr. Herrera to a term in custody, they were prepared to move

15   him more quickly.  Similarly, I spoke with Immigration

16   authorities, and to the extent your Honor is inclined to give

17   him time served, they are prepared to deport him more quickly.

18   His medical condition is going to be addressed no matter what.

19          THE COURT:  Did the people mentioned in here who

20   pled guilty plead guilty because they knew or believed that

21   Mr. Herrera was going to testify against them?

22          MR. NORKIN:  All of the people mentioned in Part 2A,

23   which are assistance that led directly to charges and arrest,

24   it was never explicitly told to them who their witnesses would

25   be.  I would doubt that they didn't know that Mr. Herrera --
```

1          THE COURT:   You believed they knew?

2          MR. NORKIN:   They would have figured it out based on

3    what was written in extradition requests, based on who else

4    was arrested.   They saw their indictment.

5

6

7

8          THE COURT:   Implicit in Ms. DeBlasio's comments

9    about he's at risk when he goes back to Colombia is the

10   assertion that people know that he cooperated with you.   Do

11   you agree with that?

12         MR. NORKIN:   I agree to an extent.   The only reason

13   I don't fully agree with the comment is not that he's not at

14   risk.   He is.   But a lot of these people are not necessarily

15   people of violence or people who are capable of violence,

16   because they don't have an organization under them, things

17   like that.   He would be at risk, for example.

18

19         THE COURT:   I mean to focus more on whether or not

20   -- because he seeks to seal this, which is contrary to our

21   basic instinct, and I really mean to focus on whether or not

22   there's a general understanding out there that he cooperated,

23   and it sounds like there is.

24         MR. NORKIN:   There is a general understanding by

25   Colombians --

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

1      THE COURT:  Right.

2      MR. NORKIN:  -- who have been here that he has

3  cooperated.

4

5

6

7

8

9

10      I don't believe there's a grave risk to Mr. Herrera

11  if he stays within Colombia.  That was the point that I wanted

12  to make.

13

14

15

16      THE COURT:  Were you involved in the debriefings?

17      MR. NORKIN:  I was not involved in the debriefings

18  prior to the guilty plea.  I was involved in some of the

19  debriefings after the guilty plea.

20      THE COURT:

21                           What's the nexus, if any,

22  between Mr. Herrera and acts of violence?

23      MR. NORKIN:  We don't have information, for example,

24  that Mr. Herrera committed acts of violence.

25

1

2

3

4

5

6

7

8

9

10

11

12          So, there is -- it wasn't widely known that Mr.

13    Herrera cooperated.  And frankly, if a letter with the U.S.

14    Government's imprimatur on it would become public, laying out

15    Mr. Herrera's cooperation and who he cooperated against, that

16    certainly would be very dangerous for Mr. Herrera even in

17    Colombia.

18

19                                   but as long as the exact

20    nature of the cooperation remains sealed and who Mr. Herrera

21    provided information about, and as long as there's not a kind

22    of a U.S. government imprimatur confirming that he was a

23    cooperator, then Mr. Herrera will be safe in Colombia.

24          THE COURT:  What do you think will happen?  Do you

25    actually -- any defendant, let alone a defendant who is

1   responsible at the really highest levels for distributing

2   eighty-five tons of cocaine into this country, do you think he

3   would get sentenced completely in the dark, that there, the

4   power of the public interest in what goes on in this courtroom

5   would result in this whole thing being under seal?  It's not

6   going to happen.  This is important stuff.  It's important

7   stuff even if he's one of the couriers at the other end of the

8   spectrum that he occupied.

9          So, I'll give you a chance to redact the letter, but

10  the people against whom he cooperated have a general awareness

11  that he cooperated.  There's a public interest in what

12  happened here.  I'm not going to sentence him in the dark.

13         MR. NORKIN:  Your Honor, thank you for the

14  opportunity to redact the letter.  We'll certainly do that.  I

15  don't agree with how your Honor comes down on this particular

16  issue.

17         THE COURT:  You're not required to.  You can address

18  it and try to talk me out of it.  There's an overwhelming

19  presumption that the sun shines on what we do.  I'll allow you

20  to submit a letter that redacts out the names, but to a

21  certain extent, this is what it is.  He's seeking

22  extraordinary leniency based on his cooperation.  I'm told

23  that the people against whom he cooperated know he cooperated.

24         MR. NORKIN:  Several of them do, and they are the

25  ones who are not violent.  They are ones -- and they don't

1    know for certain.  They surmised that.

2          I really think it would be harmful to Mr. Herrera if

3    it just had the masthead of the U.S. Government, Mr. Herrera's

4    name and "Cooperator" on a sheet of paper.  That's why I don't

5    agree with your Honor's analysis of how this comes down.  I

6    don't think even redacting the names and even redacting just

7    the specific people who are the -- the portion of the letter

8

9                I don't think that's going to keep

10   Mr. Herrera safe.

11          MS. DeBLASIO:  Your Honor, if I may?

12          THE COURT:  Yes.

13          MS. DeBLASIO:

14

15

16

17

18

19

20

21

22

23

24          THE COURT:  You're not understanding my point.

25          MS. DeBLASIO:  I'm sorry.

1     THE COURT:  I don't mean to suggest that someone at

2  his level who cooperates doesn't place himself at great risk,

3  and it's something I'll consider in calibrating his sentence.

4     But we're talking about the right, the public

5  interest, the right to publish access to what happens in a

6  courtroom.  And there are other ways to address the fact that

7  he's at risk besides essentially -- and this is what happened,

8  and to some extent you undermined yourself by saying the

9  banner of the United States Government can't even be on the

10  letter.  You have not sought to seal the courtroom.  You have

11  not sought under Alcantara to close proceedings.

12     To the extent you are suggesting the world is really

13  the way it is in connection with this case, you really haven't

14  done what you should have done.

15     But putting that aside, you know, there are other

16  ways to deal with the risk besides closing the courtroom.

17  There's a way to protect witnesses.  You're right.  I have

18  been around the block on this issue a few times.

19     You know, one way to deal with it is to have a

20  closed proceeding that runs contrary to the very fabric of

21  what we do here.  Another is to deal with it, right, protect

22  him.  I'm not suggesting he's not deserving of protection, but

23  the protection can't take the form of us just throwing out the

24  window the presumption of access to what happens here.

25     The public has a great interest in every case.

1   probably has a heightened interest in this case.

2   Extraordinary leniency is being sought based on his

3   cooperation, of \

4   folks in Colombia specifically are aware, and the public ought

5   to be able to see what happens in a situation like that.

6         So, I'll allow you, as I mentioned, to redact this

7   letter.  But you have not persuaded me at all that the

8   tremendous burden that you bear in seeking to seal the

9   proceedings has been satisfied at all.

10         MR. NORKIN:  Your Honor, I didn't seal the

11   courtroom, because there's a difference between, again, an

12   imprimatur of the government stamp and someone walking in and

13   seeing the proceedings.

14         THE COURT:  Someone walked in.  You're standing here

15   giving the government's stamp.  What are you talking about?

16         MR. NORKIN:  That's a U.S. citizen that's not

17   necessarily going to go and provide that information

18

19

20         THE COURT:  Well, there's a certain price you pay

21   for cooperating, and that price, which insures that he's

22   turned his back on that particular life of crime, is he can't

23   go back to it, because they'll kill him.  There's a certain

24   price that you have to pay as an Assistant United States

25   Attorney and the government has to pay to get people to

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

1  cooperate, and that is, you got to protect them, the answer to

2  which is not star chamber proceedings. You protect him.

3  There are other avenues available to you. You're laughing,

4  but maybe you don't know what they are, or you think it's

5  funny. You know what they are.

6         MR. NORKIN: Yes, your Honor.

7         THE COURT: There are ways to have him not get

8  deported. There are ways to protect him.

9         MR. NORKIN: But we can't do that.

10        THE COURT: You have an obligation to protect him,

11  and one tool in your arsenal of protection for these witnesses

12  is not to just jettison the right of public access when he

13  gets sentenced. Do you have authority for this? What's your

14  authority to seal this entire proceeding?

15        MR. NORKIN: The authority are the cases that I have

16  listed at the end of my letter that talks about ongoing

17  investigations.

18        THE COURT: Those authorities, you would admit,

19  require the least restrictive alternative?

20        MR. NORKIN: Correct.

21        THE COURT: Some people already know he's

22  cooperated.

23        MR. NORKIN: They surmise he's cooperated, and

24  that's a difference.

25        THE COURT: As I say, you are not required to agree

ANTHONY M. MANCUSO, CSR OFFICIAL COURT REPORTER

25

1    with me.  You are just required to comply with what I tell you

2    to do.  What I am telling you to do is to adapt to my denial

3    of your application to seal your letter in its entirety, and

4    seal these proceedings in its entirety.

5           Let's get back to the important business at hand.

6    Anything else with regard to the appropriate sentence?

7           MR. NORKIN:  No, your Honor.

8           THE COURT:  From you?

9           MS. DeBLASIO:  No, your Honor.  Thank you.

10          MR. ROSENBAUM:  No, sir.

11          THE COURT:  Sorry for the distraction.

12          Your cooperation is deserving of great

13   consideration.  Near as I can tell, it's the only thing really

14   on the favorable side, on the mitigating side, of your ledger.

15   I'm concerned about your medical condition, but I'm not

16   satisfied it can't adequately be addressed within the Bureau

17   of Prisons.

18          You have to appreciate -- well, you don't have to,

19   but I'm going to tell you anyway.  The perspective that I

20   bring to this, and that is, I see so many people -- I'm the

21   first one to criticize these Guidelines in cases other than

22   ones like yours, because I see people at the other end.  I see

23   the couriers, the hand-to-hand street dealers, the addicts who

24   are watching out.  They are the lookouts for the one-,

25   two-kilogram drug deals, and I see them in this weight-driven

1   system of ours getting clobbered. They don't make any money,

2   to speak of. They incur all the risk, don't get much of the

3   benefits. A lot of them don't have seventeen years of

4   involvement. A lot of them are down and out. So, they are

5   the ones who are kind of the front lines of the type of

6   organization that you were at the top of.

7          It's a window into so many different things, what

8   these drugs do to our communities, the impact that the

9   sentencing provisions have on the least culpable. If one were

10   to try to use percentages to compare their culpability to

11   yours, I mean, there would be so many zeros after the decimal

12   point in describing their culpability. They are like a grain

13   of sand and you are the beach, in terms of responsibility,

14   seriousness of the offense.

15          I'm not persuaded that you were motivated by

16   anything but your own self-interest, whether it was giving up

17   the drug trafficking because you wound up with this extortion

18   scheme. Your cooperation, you could have cooperated before

19   you got locked up. But that's okay, you are allowed to act in

20   your self-interest. You are kind of expected to, and you're

21   permitted to be rewarded for it if your self-interest puts

22   scalps on the government's belt, as it has here. It's

23   important.

24          Ms. DeBlasio is exactly right. There's a completely

25   legitimate judicial interest in rewarding your cooperation,

1   not because we are part of that team.  We are not part of the

2   Executive Branch.  There's a public interest in awarding the

3   assistance I give, because it results in the arrest and

4   prosecution and imprisonment of people like you.

5           And to get assistance like yours -- because, as I

6   say, people don't step forward as a matter of civic duty, they

7   only step forward if there's something in it for them, and if

8   there's not enough in it for them, they are going to stop

9   stepping forward -- that's the reason and the only reason you

10  are going to get leniency from me, because your sentence is

11  supposed to reflect the seriousness of your crime and it

12  doesn't get any more serious than you.

13          I suppose it might if you were personally engaged in

14  acts of violence, but I think Ms. DeBlasio did a good job

15  fronting that issue.  You know, you are a smart guy.  You know

16  what the deal is.  You know what those entities do that you

17  were dealing drugs to.  In your distant way, you have, as your

18  lawyer suggests, by fronting the issue with me, you know in

19  your own way you have some association with that.  It's not

20  just the eighty-five tons conservatively estimated.  It's all

21  that other carnage.

22          So, it's difficult.  There's a lot of factors a

23  judge has to consider in imposing sentence.  They're all in

24  one direction or another in every case.  But two of them

25  dominate your sentence.

1          One is the need to adequately reflect in your
2    sentence the seriousness of your crime.  That pulls really,
3    really strongly in one direction.  And the other is to
4    adequately reward what you did by cooperating with the
5    government immediately, in your self-interest, but that's
6    okay, immediately, apparently well, completely, extensively,
7    effectively, producing convictions.  So, those two things are
8    at serious tension with one another in this case.

9          It doesn't give me any pleasure to tell you that I
10   don't believe that time served is appropriate.  I don't think
11   the extent to which your sentence has to reflect the
12   seriousness of your crime can be accommodated by giving you a
13   time-served sentence.

14         How much time does he have in, again?

15         MR. ROSENBAUM:  51, a little more than 51 months,
16   including the eleven months in Colombia.

17         THE COURT:  Is the Bureau of Prisons going to count
18   that?

19         MR. NORKIN:  Yes.

20         MS. DeBLASIO:  I think your Honor has to request the
21   Bureau of Prisons does.

22         MR. ROSENBAUM:  Reflected in the J&C.

23         THE COURT:  The 51 he has in, and the eleven months
24   in Colombia, and you want me to take that into account and be
25   explicit in the judgment?

29

1          MS. DeBLASIO:  Yes, your Honor.

2          MR. ROSENBAUM:  That's correct.

3          THE COURT:  I've considered all the factors under

4    3553(a).  But as I say, the dominant ones are the ones that I

5    have described.  Taking them all into account, the sentence is

6    nine years in the custody of the Attorney General, to be

7    followed by a five-year term of supervision, with the special

8    conditions that the defendant may not reenter the United

9    States again illegally if he's excluded or deported.  A

10   prohibition on the possession of a firearm.

11         There's a forfeiture obligation; is that correct?

12         MR. NORKIN:  There was, according to the plea

13   agreement, there was a $22 million money judgment that we were

14   seeking.  We were going to seize properties, and Mr. Herrera

15   was trying to help us seize those properties.  It did not end

16   up happening.

17         We would still ask for a money judgment in the event

18   that Mr. Herrera does obtain assets later that we could seize,

19   although the reality is, that's probably academic, because

20   he's going to be deported to Colombia and is unlikely to

21   invest in anything in the U.S. that could be seized after that

22   point.

23         THE COURT:  In any event, by agreement, there is a

24   $22 million personal money judgment forfeiture; is that

25   correct?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1          MR. ROSENBAUM:  Yes.

2          MR. NORKIN:  That is correct.

3          THE COURT:  So, that's imposed, as is a financial

4    disclosure requirement.  So, to the extent it becomes, as a

5    practical matter, something of significance, the probation

6    officer can monitor compliance with it.

7          There's a $100 special assessment, but no fine.

8          Which of the FMC's are you requesting me to

9    recommend designation to?

10          MS. DeBLASIO:  Your Honor, I have not spoken

11   specifically.  Butner, I know, is supposed to be quite good.

12          THE COURT:  Springfield, Butner, Devens.

13          MS. DeBLASIO:  Rochester.  I put them in the letter.

14   There are four.  It forget the fourth one's name.  Lexington.

15          THE COURT:  Do you have one in mind?

16          MS. DeBLASIO:  Literally, may I ask?  His family

17   hasn't been able to visit.

18          (Pause.)

19          MS. DeBLASIO:  He doesn't know.

20          MR. ROSENBAUM:  Just the appropriate facility that

21   the Bureau of Prisons can handle.  I think it would be like a

22   medical four.

23          MS. DeBLASIO:  The four I have mentioned.  I'll say

24   Butner.

25          THE COURT:  I'll say a recommendation to the FMC.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    If you have one in particular in mind in the next few days,

2    call my clerk, and we'll put it on the judgment.

3              MS. DeBLASIO:  Thank you, your Honor.

4              THE COURT:  Any open counts?

5              MR. NORKIN:  On open counts, the government moves to

6    dismiss them at this time, and also underlying indictments.

7              THE COURT:  Okay.  The open counts in S-2 are

8    dismissed.

9              MR. NORKIN:  It is S-3.

10             THE COURT:  It's S-3?

11             MS. DeBLASIO:  Count Three of S-2.

12             MR. NORKIN:  Count Three of S-2.

13             He was also named in S-3, and there are a variety of

14   counts that he's named in those.  We would move to dismiss all

15   of those to the extent there's any confusion.

16             THE COURT:  He's sentenced on a count in S-2;

17   correct?

18             MR. NORKIN:  Yes.

19             THE COURT:  Count Three in S-2 is the offense of

20   conviction.

21             S-3, the other counts in S-2, S-1 and no S are all

22   dismissed.

23             Good luck.

24             MR. NORKIN:  Your Honor, one last thing, if I may?

25   I'm sure you will reject this application, but I have to make

1    it anyway.  I would ask that the record of this proceeding be

2    sealed for the same reasons as we wanted the letter sealed.

3              I understand your Honor's position on this, and I

4    appreciate that, and particularly your Honor, more than

5    probably many judges, knows the various tools that are

6    available for protecting a witness.  I'm sure your Honor is

7    also aware, though, that those tools can't necessarily be

8    applied to everyone, and the system would grind to a halt if

9    we tried to apply those tools to everyone.

10             I think your Honor makes an excellent policy point,

11   and maybe we should be reconsidering how we do those cases.

12   But with Mr. Herrera, he's an individual who is here, and this

13   is the situation that he faces, and whatever the policy, the

14   broader policy reasons that could be debated on a higher

15   level, they are going to impact your -- your decision here is

16   going to impact him in a very real way, and for that reason,

17   we would ask that the transcript be sealed.

18             THE COURT:  The application to seal the transcript

19   is granted temporarily.  We'll keep it under seal.  It will be

20   made public, unless by a week from today I get a proposed

21   redact version of the transcript.

22             Some part of this transcript will become public.

23   You can propose the redaction.  I encourage you to be as

24   surgical as you can to try to bear in mind the principles I

25   spoke of earlier.  But I will allow a partial sealing of this

33

1    transcript.  You can certainly take the names out, but I'm not
2    sealing all of it.
3            So, by a week from today, you'll get a copy of the
4    transcript.  Provide, a week from today, the proposed
5    redactions.
6            If you can do that in electronic form, that would be
7    useful.
8            The same with the 5K.  By a week from today, I want a
9    proposed redacted version of the 5K motion.
10           In the meantime, no one gets access to this
11   transcript.
12           Have a good day.
13                        Ooooooo0ooooooo0
14
15
16
17
18
19
20
21
22
23
24
25

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER